■ CORNHUSKER FARMS, INC., Respondent-Appellant, v HUNTS POINT COOPERATIVE MARKET, INC., Appellant-Respondent. [769 NYS2d 228]—

Order, Supreme Court, Bronx County (Paul Victor, J.), entered April 16, 2002, which granted defendant's motion to dismiss the complaint to the extent of dismissing the tenth and eleventh causes of action, and otherwise denied the motion, unanimously

modified, on the law, to grant the motion to dismiss also with respect to the second, third, fourth, seventh, eighth and ninth causes of action, and with respect to the first cause of action except to the extent such first cause of action alleges that defendant breached the Subscription Agreement, dated July 26, 1999, as amended, by failing to comply fully with the specifications of Exhibit D annexed to such Subscription Agreement, and otherwise affirmed, without costs.

Plaintiff meat wholesaler (Cornhusker) and defendant marketing cooperative (the Co-op) entered into a Subscription Agreement, dated July 26, 1999, under which, inter alia, Cornhusker was to purchase certain shares of the Co-op, and to sublease from the Co-op a refrigerated warehouse (the Unit) to be built by the Co-op pursuant to the agreement. The Subscription Agreement designated as "Landlord's Work" the portion of the construction work for the Unit set forth on annexed "Exhibit D," and provided that, "other than Landlord's Work, [the Co-op] is not obligated to undertake any work or make any improvements to the Unit, it being agreed that all work other than Landlord's Work which is necessary or desirable to prepare the Unit for use or occupancy by [Cornhusker] shall be performed by [Cornhusker] at [Cornhusker's] sole cost and expense . . . ." The Subscription Agreement further provided that Cornhusker was to contribute $2,288,498 to the cost of the construction of the Unit (the Construction Payment), based in part on an estimated construction budget annexed to the agreement as Exhibit C. The Subscription Agreement contained standard merger and no-oral-modification clauses. Finally, a Side Letter reciting that the parties executed it "simultaneously" with the Subscription Agreement (the Side Letter) provided that, of Cornhusker's total Construction Payment of $2,288,498, the amount of $1,260,498 was for "actual hard construction costs," and $1,028,000 was an estimate of the cost of the balance of the work, which estimated amount "shall be adjusted based upon the actual completion costs."

Nearly one year after the execution of the Subscription Agreement and the Side Letter, the parties entered into a letter agreement, dated June 12, 2000, which stated that the parties "desire[d] to modify the Subscription Agreement as hereinafter set forth." In that regard, the June 2000 letter agreement clarified that the amount of Cornhusker's contribution to the Unit's construction costs set forth in the Subscription Agreement "represented the parties' estimate of the construction costs at the time that the Subscription Agreement was executed," and increased that contribution from $1,260,498 to $1,765,688 based

on an annexed revised estimated construction budget that was "substituted for the Exhibit C attached to the Subscription Agreement." The final paragraph of the June 2000 letter agreement provided that "[a]ll other terms and conditions of the Subscription Agreement shall remain in full force and effect except as specifically modified herein, and as modified hereby are ratified and confirmed."

In August 2001, Cornhusker commenced this action against the Co-op, in which Cornhusker alleges principally that the Co-op committed various breaches of the Subscription Agreement in building the Unit. In lieu of answering, the Co-op moved to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7), relying on the contractual documents themselves. The IAS court denied the motion as to all but 2 of the 11 causes of action. On the Co-op's appeal and Cornhusker's cross appeal, we modify to grant the motion as to all causes of action except the fifth, the sixth, and a portion of the first, and remand for further proceedings thereon.

The first cause of action alleges that the Co-op breached the Subscription Agreement by failing to build the Unit in conformity with (1) Exhibit D to the Subscription Agreement and (2) certain plans for the Unit (the Plans) drawn up by architects the Co-op retained pursuant to a December 1998 letter of intent that preceded the Subscription Agreement. This cause of action is legally sufficient insofar as it is based on allegations that the Co-op breached the Subscription Agreement by failing to comply fully with Exhibit D, i.e., by allegedly failing to provide the Unit with certain items expressly identified as part of the Landlord's Work by Exhibit D, namely, electric overhead doors, dock locks and vapor barriers (as alleged in paragraph 33 of the complaint). Accordingly, the IAS court correctly sustained the portion of the first cause of action based on the Co-op's alleged noncompliance with Exhibit D to the Subscription Agreement.

We are constrained, however, to dismiss the remainder of the first cause of action. To the extent the first cause of action is based on the Co-op's alleged noncompliance with the Plans, it is legally insufficient because the Plans are not referenced anywhere in the contractual writings signed by the parties, namely, the Subscription Agreement, the Side Letter and the June 2000 letter agreement. The Subscription Agreement's strict merger clause[1] and no-oral-modification clause[2] establish that it is an integrated writing, and, as a matter of law, bar any claim based on an alleged agreement to build the Unit accord-

---

1. The Subscription Agreement's merger clause provides: "This Subscription Agreement sets forth the entire agreement of [the parties] with respect to

ing to the Plans that the parties failed to express either in the Subscription Agreement itself or in a signed written amendment (*see Jarecki v Shung Moo Louie*, 95 NY2d 665, 669 [2001]; *W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162-163 [1990]; *Unisys Corp. v Hercules Inc.*, 224 AD2d 365, 368-369 [1996]). Contrary to the view of the IAS court, we may not create an ambiguity in the otherwise unambiguous Subscription Agreement by viewing it in the context of the Plans or other extrinsic evidence (*see Reiss v Financial Performance Corp.*, 97 NY2d 195, 199 [2001]; *W.W.W. Assoc.*, 77 NY2d at 163).

We find no merit in Cornhusker's strained contention that references in the Subscription Agreement to certain documents other than the Plans, including an annexed floor plan showing the dimensions of the space to be subleased, can be construed as "indirect[ ] reference[s]" to the Plans. If these commercially sophisticated and counseled parties had intended to make the Plans part of their agreement, they could easily have accomplished that purpose by drafting the contractual writings so that one or more of them expressly incorporated the Plans by reference. Since the Plans are not referenced in the contractual documents at all, much less "referred to and described [therein] . . . so as to [be] identif[ied] . . . beyond all reasonable doubt" (*Shark Info. Servs. Corp. v Crum & Forster Commercial Ins.*, 222 AD2d 251, 252 [1995] [internal quotation marks omitted]), the Plans cannot be deemed to be incorporated by reference into the Subscription Agreement.

Cornhusker's second and fourth causes of action allege that the Co-op breached the Subscription Agreement and the Side Letter, respectively, by billing Cornhusker for items not provided by the original construction budget annexed to the Subscription Agreement as Exhibit C, or for amounts in excess of those provided by that original construction budget. Similarly, the third cause of action alleges, in substance, that the Co-op breached alleged "warranties" of the "feasibility" of completing the Unit at a cost within the original construction budget. These causes of action are barred by uncontroverted documentary evidence, namely, the June 2000 letter agreement and the revised construction budget annexed thereto. The June 2000 letter agreement was executed for the express purpose of "modify-[ing]" the Subscription Agreement, and, to that end, expressly

---

the subject matter hereof, and all prior understandings and agreements including the [December 1998] Letter of Intent, are merged herein."

2. The Subscription Agreement's no-oral-modification clause provides: "This Subscription Agreement may not be modified or amended orally, but only by a writing signed by the parties hereto."

"substituted" the annexed revised construction budget for the original construction budget annexed to the Subscription Agreement as Exhibit C. Thus, the original construction budget, on which Cornhusker bases its second, third and fourth causes of action, no longer has any contractual force, having been contractually replaced by the revised construction budget (*see Bronx Store Equip. Co. v Westbury Brooklyn Assoc.*, 280 AD2d 352, 353 [2001]). Accordingly, the second, third and fourth causes of action should be dismissed.

The fifth cause of action alleges that the Co-op breached its obligation under the Subscription Agreement to "enter into a construction management contract with Jeffrey M. Brown Associates, Inc. [JMBA] or another construction manager approved by the City of New York." To the extent Cornhusker contends that JMBA was not qualified to act as construction manager for this project, such contention is contractually precluded by the Subscription Agreement's provision expressly contemplating JMBA's retention in that capacity. However, Cornhusker has stated a cause of action to the extent it contends that the Co-op's agreement with JMBA did not satisfy the Co-op's obligation to enter into a "construction management contract" within the meaning of the Subscription Agreement. The form used for the JMBA agreement contemplated a project where "the Construction Manager is NOT a Constructor" (emphasis in original), and the form was altered by the Co-op and JMBA before they signed it. Since the Subscription Agreement does not define the term "construction management contract," we cannot determine from the Subscription Agreement itself whether the parties did or did not intend the construction manager to be a "constructor." Further, even if the unaltered form used for the JMBA agreement would have satisfied the Subscription Agreement, we cannot determine whether the alterations to that form rendered the actual agreement with JMBA unsatisfactory. We note that parol evidence will be admissible to resolve the ambiguity in the Subscription Agreement that we have identified (*see e.g. Unisys Corp.*, 224 AD2d at 367). Finally, the Co-op's contention that Cornhusker lacks standing to sue for any breach of the Co-op's obligation to retain a construction manager for this project is entirely without merit. Accordingly, the fifth cause of action was correctly sustained.

The IAS court also correctly declined to dismiss the sixth cause of action, which seeks damages for the Co-op's alleged failure to substantially complete work on the Unit within the time provided by the Subscription Agreement. The Subscription Agreement gave Cornhusker the right to terminate the agree-

ment if the Unit were not substantially complete within 18 months, i.e., by January 26, 2001, subject to the Co-op's right upon such termination to serve a notice extending the time for completion by another 90 days, i.e., through April 26, 2001. The Subscription Agreement further provided that "[i]n the event of such termination, [Cornhusker] shall have all of its rights and remedies, at law or in equity, all of which are hereby reserved." The complaint alleges that the Unit was not substantially complete by either January 26 or April 26, 2001. Although it is undisputed that Cornhusker never exercised its right to terminate, Cornhusker has stated a cause of action for any damages it has suffered by reason of the failure to complete the work within the time frame contemplated by the agreement. Contrary to the Co-op's argument, the express provision that Cornhusker would have the right to terminate for untimely completion does not negate Cornhusker's right to sue for damages for delay in the event it chose not to exercise the right to terminate. Had the parties intended to preclude Cornhusker from suing for delay damages unless it terminated the agreement, they could have included an express provision to that effect.

Cornhusker's remaining causes of action should be dismissed. The seventh cause of action, alleging that the Co-op has committed "anticipatory breach" by stating that it does not intend to construct certain items allegedly required by the Subscription Agreement, is duplicative of the first cause of action insofar as we have sustained it. Similarly, the eighth cause of action, for breach of the implied covenant of good faith and fair dealing, is duplicative of the sustained causes of action alleging breaches of specific provisions of the Subscription Agreement (*see e.g. Engelhard Corp. v Research Corp.*, 268 AD2d 358, 358-359 [2000]). The ninth cause of action, seeking declaratory relief, should be dismissed as unnecessary in view of the undisputed fact that Cornhusker has already taken possession of the Unit and has stipulated to begin paying rent, thereby rendering all disputes between the parties retrospective and susceptible to resolution in the context of the claims for legal relief. The tenth cause of action, for fraud, was properly dismissed as duplicative of the contract causes of action (*see e.g. Coppola v Applied Elec. Corp.*, 288 AD2d 41, 42 [2001]). Finally, the IAS court correctly dismissed the eleventh cause of action, for unjust enrichment, on the ground that the existence of a valid and enforceable written contract precludes recovery on a theory of unjust enrichment (*see Clark-Fitzpatrick, Inc. v Long Is. R.R. Co.*, 70 NY2d 382, 389 [1987]). Concur—Buckley, P.J., Nardelli, Andrias, Friedman and Gonzalez, JJ.